**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ELLEAN NANCE (B-60068), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-cv-4124 |
| v. | ) | |
| | ) | Hon. Steven C. Seeger |
| ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Ellean Nance was incarcerated at Stateville Correctional Center during the COVID-19 pandemic. He believes that the Illinois Department of Corrections did not do enough to contain the spread of the virus and protect him from potential harm.

So Nance sued various officials at the IDOC in their individual capacities, bringing claims under the Eighth Amendment and state law. He also sued Wexford Health Sources, the company that provided medical care to inmates.

After discovery, Defendants moved for summary judgment. For the following reasons, Defendants' motions are granted.

**Non-Compliance with the Local Rules**

Before diving in, this Court must address Nance's failure to comply with the Local Rules. The punchline is that Nance's summary judgment submissions were stricken by this Court. The filing was late, and Nance requested a fourth extension based on false pretenses. So the filings count for nothing.

Local Rule 56.1 establishes the procedure for filing and opposing a motion for summary judgment. The moving party must provide a "statement of material facts that complies with [Local Rule] 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). The statement of facts must rest on evidence in the record, with user-friendly citations. "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

The non-movant must respond to a motion for summary judgment by filing (1) a memorandum of law; and (2) a response to the movant's statement of facts. *See* L.R. 56.1(b)(2). The response to the movant's statement of facts must "consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement of facts. *See* L.R. 56.1(e)(1).

Wexford filed for summary judgment on July 28, 2025, and the other defendants moved for summary judgment on August 4, 2025. This Court set a briefing schedule, and gave Nance a generous amount of time to respond.

The scheduling order set a deadline of September 15, 2025, for the responses. That's six weeks after the filing of the motions. *See* 7/31/25 Order (Dckt. No. 161).

On August 22, 2025, Nance filed a motion for a two-week extension of time. *See* Mtn. for Extension (Dckt. No. 168). This Court granted that request, and reset the deadline for September 29, 2025. *See* 9/8/25 Order (Dckt. No. 169).

On September 25, 2025, a few days before the deadline, Nance filed a motion for a second extension of time. Nance requested a 30-day extension. *See* Second Mtn. for Extension (Dckt. No. 170). This Court granted that request, and reset the deadline for October 31, 2025. *See* 10/3/25 Order (Dckt. No. 171).

Right before the deadline, Nance filed a motion for a third extension of time. *See* Third Mtn. for Extension (Dckt. No. 172). Once again, this Court gave Nance more time. This Court granted a three-week extension and reset the deadline for November 21, 2025. *See* 10/29/25 Order (Dckt. No. 173).

Putting that deadline in perspective, Nance had over three and a half months to respond. Defendants moved for summary judgment by August 4, and the deadline for a response was November 21.

That's plenty of time. And this Court let Nance know that the latest extension was the last extension. The order made clear that it was the "final extension." *Id.*

That deadline came and went. And Nance submitted no response.

On December 5, 2025, Nance filed a motion for a fourth extension of time. *See* Fourth Mtn. for Extension (Dckt. No. 176). He claimed that he had been placed in segregation and did not have access to legal materials. *See* Pl.'s Additional Info. in Supp. of Mtn., at 1–3 (Dckt. No. 178).

This Court was skeptical of the request. Even so, if Nance was in segregation on the due date, and was physically unable to file anything, that reality might create an extraordinary reason for a modest extension. So, this Court provisionally granted an extension until January 13, 2026. *See* 12/29/25 Order (Dckt. No. 179).

The order expressly stated that this Court was "more than a little skeptical of the request," given the history of extensions. After all, the motion did not "reveal when Plaintiff was in segregation." *Id.* And Nance mailed the motion more than a week after the deadline.

3

Even then, Nance sat on his hands after asking for the fourth extension. "To make matters worse, Nance mailed the request almost a month ago, and has not filed anything since then." *Id.*

This Court wanted to get to the bottom of things, and make sure that it was getting the full story. This Court directed defense counsel to file a statement and reveal when, exactly, Nance was in segregation. *Id.*

Before long, defense counsel cleared things up. Defense counsel answered the question, and it wasn't a helpful answer for Nance. *See* Status Report (Dckt. No. 183).

As it turns out, Nance was in segregation from November 28 to December 26, 2025. Putting those dates in perspective, on October 29, this Court granted the third request for an extension, and set the deadline for November 21.

So the deadline was November 21, and Nance entered segregation on November 28. The deadline passed one week *before* Nance entered segregation. When he entered segregation, Nance had already missed the deadline.

What's more, the status report from defense counsel stated that the Corrections Law Library Assistant did not receive any law library requests from Nance in November or December, except on December 23. So Nance did not attempt to go to the law library during those two months.

Nance had some explaining to do. He later filed a supplemental statement, but it didn't help his cause. *See* Statement (Dckt. No. 185). Nance stated that he couldn't have been released from segregation on December 28 because it was a Sunday, but that's not the issue. *Id.* Nance did not deny that he entered segregation after he missed the deadline of November 21.

In the meantime, Nance filed responses to the motion for summary judgment on January 15, 2026, and on January 20, 2026. *See* Resp. (Dckt. Nos. 184, 186).

Overall, it takes some time to review the nitty-gritty parts of the docket, and put the story together. But after digging into the filings, it is not hard to see what happened. Nance received a generous briefing schedule. He then requested and received three extensions of time. This Court granted each request, and then declared that the third extension was the last.

Nance missed that deadline. And then, he requested a fourth extension based on a false representation to the Court. He represented that he needed more time because he was in segregation in November. In reality, he did not enter segregation until November 28, one week after the deadline.

The long and the short of it is that Nance lied to this Court. He used segregation as a pretext for getting more time. In reality, he missed the deadline, and then used the segregation as a false reason for more time.

The legal system depends on truth-telling. Litigants must tell the truth in their statements to the Court. The judicial system administers justice, and cannot operate based on falsehoods. Plus, giving false information to the Court wastes judicial resources. Nance wasted this Court's time.

So this Court issued an order on April 10, 2026, and vacated its order granting Nance the fourth extension. *See* 4/10/26 Order (Dckt. No. 191). This Court found that Nance missed the deadline of November 21, 2025, and then obtained an extension based on false pretenses. So the Court struck all of this summary judgment filings as a sanction. *Id.* "All of the filings are deemed late, and were filed after making false statements to this Court. So they count for nothing." *Id.*; *see also* 4/27/26 Order (Dckt. No. 196).

There is plenty of case law saying that pro se litigants must comply with the rules. "Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules." *Coleman v. Goodwill Indus. of Se. Wisconsin, Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011). "It is well-settled that a plaintiff's pro se status does not excuse him from complying with federal and local procedural rules." *Parker v. Fern*, 2024 WL 1116092, at *2 (N.D. Ill. 2024); *see also Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though [the] employee was [a] pro se litigant."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven pro se litigants must follow procedural rules."); *McCladdie El v. United Airlines, Inc.*, 2025 WL 2084228, at *1 (N.D. Ill. 2025) ("Any party, including a pro se litigant, who fails to comply with Local Rule 56.1 does so at their own peril.").

The situation at hand does not involve a mere failure to comply. It involves false representations to the Court. So everything was stricken.

The long and the short of it is simple. Defendants' statements of facts are deemed admitted because Nance failed to respond in a timely manner. *See* L.R. 56.1(e)(3).

### Background

Ellean Nance was incarcerated at Stateville Correctional Center when the COVID-19 pandemic began. *See* Def. Wexford's Statement of Facts, at ¶¶ 7, 9 (Dckt. No. 155); IDOC Statement of Facts, at ¶ 2 (Dckt. No. 164).

On March 9, 2020, Governor J.B. Pritzker issued a disaster proclamation, and on March 13, 2020, President Trump declared a national emergency. *See* Def. Wexford's Statement of Facts, at ¶ 9 (Dckt. No. 155).

6

David Gomez was Stateville's Warden at the time. *See* IDOC Statement of Facts, at ¶ 9 (Dckt. No. 164). Gomez was responsible for running Stateville, including developing policies, procedures, rules, regulations, and institutional directives for employees and inmates. *Id.* at ¶ 11.

Rob Jeffreys was IDOC's Acting Director. *Id.* at ¶ 10. Clarence Egbe, LaJuana McGruder, Victoria Jones, Lauren Hoeft Blanchard, Edwin Juarez, Tovanna Taylor, and Timothy Woodcock were correctional officers at Stateville. *Id.* at ¶ 8.[1]

Wexford Health Sources provided medical care to inmates at Stateville as a vendor for IDOC. *See* Def. Wexford's Statement of Facts, at ¶ 44 (Dckt. No. 155).

**IDOC's Response to the COVID-19 Pandemic**

The record includes an in-depth summary of the steps that the IDOC took to protect inmates in response to the once-in-a-generation (and then some) pandemic.

As early as March 2020, IDOC began issuing bulletins to inmates about its response to the pandemic. *Id*. at ¶¶ 10, 12–25, 31–40.[2] A March 11, 2020 bulletin advised that "COVID-19 causes upper respiratory disease similar to the flu" and "in most cases . . . resolves without complications." *See* Wexford Ex. 5, at 2 (Dckt. No. 155-4).

The bulletin advised inmates about preventative measures that they could take, and instructed them to alert a healthcare provider or correctional officer if they had a fever. *Id.* The bulletin also advised that there were no confirmed cases in any IDOC facility as of that date. *Id.*

---

[1] The Court refers to Gomez, Jeffreys, Egbe, McGruder, Jones, Blanchard, Juarez, Taylor, and Woodcock collectively as the "IDOC Defendants."

[2] In their statement of facts, Wexford repeatedly cited to IDOC's bulletins with "*Id.*" even when the prior citation wasn't to the particular IDOC bulletin being referenced. But Wexford attached all the bulletins as exhibits to its submission. The Court cites to the particular exhibit under discussion.

IDOC reported that it was monitoring the situation, and taking guidance from the Illinois Department of Public Health ("IDPH"). IDOC stated that "[t]here is currently no recommendation to disrupt normal activities in our facilities, unless told to do so by IDPH." *Id.*

On March 16, 2020, IDOC advised inmates that it had consulted with "internal and external experts" and implemented a plan to quarantine asymptomatic individuals "with exposure to risk factors" and to isolate symptomatic individuals "with exposure to risk factors." *Id.* at 3. Three days later, IDOC notified inmates that it had suspended in-person visits. *Id.* at 4.

IDOC also advised that there were no confirmed cases of COVID-19 in IDOC facilities at the time. *Id.* at 5. IDOC reiterated the importance of personal preventative measures and explained that it continued to monitor the situation closely and was taking guidance from the IDPH. *Id.* at 5–7.

On March 20, 2020, IDOC implemented an administrative quarantine across its facilities. *See* IDOC Statement of Facts, at ¶ 36 (Dckt. No. 164). IDOC continued to provide inmates with access to showers, telephone calls, cleaning supplies, law library services, and commissary. *See* Quarantine Notice (Dckt. No. 164-4). But it restricted movement within IDOC facilities to protect the health and safety of inmates and staff. *Id.*

On March 25, 2020, IDOC notified inmates that it had identified the first confirmed cases of COVID-19 across its facilities, including three staff and three inmates. *See* Wexford Ex. 5, at 8 (Dckt. No. 155-4). Stateville was one of the affected facilities, among others. *Id.*

But IDOC assured that "a team of medical professionals and security specialists" was addressing inmate safety, and that IDOC guidelines "closely follow" the protocols recommended by the Centers for Disease Control and the IDPH. *Id.*

During the following weeks, the number of confirmed COVID-19 cases in IDOC facilities increased. *Id*. at 9. As of April 2, 2020, Stateville reported 49 cases and one death. *Id.* Staff who tested positive for COVID-19 were quarantined at home, and the Illinois National Guard had been deployed to Stateville. *Id.* IDOC was "waiting on the results of more than 200" COVID-19 tests and anticipated additional confirmed cases. *Id.*

The April 2, 2020 bulletin also advised that IDOC was working with security and healthcare experts to develop best practices to protect inmates. *Id*. And the bulletin summarized measures that IDOC had already implemented, including the administrative quarantine, suspended in-person visitations, and halted transfers, admissions, and non-emergency furloughs. *Id*.

It also continued to push for inmates to adhere to personal protective measures. *Id.* The bulletin stated that IDOC provided staff with daily "Personal Protective Equipment (PPE), like face masks." *Id.* at 9–10.

IDOC explained that providing staff with daily PPE was intended to "prevent them from introducing the virus from an outside source and causing it to spread." *Id.* at 10. IDOC advised that it would "continue to evaluate what measures need to be taken to" keep inmates and staff safe and healthy. *Id.*

On April 5, 2020, Warden Gomez issued a Memorandum to the "Men in custody at Stateville Correctional Center." *Id.* at 22–23. Gomez detailed the measures that had been implemented, or were being implemented, to mitigate spread of the virus at the facility. *Id.*

Stateville worked to separate symptomatic inmates from asymptomatic inmates, distribute hand sanitizer and cleaning supplies, and issue inmates a protective surgical mask. *Id*.

9

Stateville had started taking inmates' temperatures three times a day, too. *Id.* And Statesville established new shower, commissary, and phone schedules that adhered to the quarantine. *Id.*

Gomez reported that the safety measures had been developed by Stateville's Administrative Team, with guidance from the IDOC Office of Health Services, IDPH, the Centers for Disease Control, the Illinois Emergency Management Agency, and the Governor's Office. *Id.*

COVID-positive cases continued to increase. On May 4, 2020, IDOC reported that 124 inmates at Stateville had tested positive for COVID-19. *Id*. at 11. Twelve inmates had died, but 119 recovered. *Id.*

Testing for COVID-19 continued at IDOC facilities, and IDOC officials anticipated that positive cases would increase, "just as is predicted throughout Illinois and the United States." *Id.* at 12. Inmates were instructed that they were "require[d]" to wear "the mask issued to you[.]" *Id.* Staff also had to wear masks, and the Offender Yard (which had recently reopened) was closed because of concerns about "cross contamination of offenders." *Id.* at 24.

Stateville worked to complete "a goal of contact tracing offender movement to ensure there is no further spread." *Id.* IDOC also reiterated the importance of handwashing and masking on May 21, 2020. *Id.* at 14–15.

During the following 19 months, IDOC continued mitigation measures. *See* Def. Wexford's Statement of Facts, at ¶¶ 38–39 (Dckt. No. 155); IDOC Statement of Facts, at ¶ 39 (Dckt. No. 164). For example, safety measures remained in place as of September 22, 2020. *See* Wexford Ex. 5, at 16 (Dckt. No. 155-4).

IDOC continued to restrict movement within facilities, and isolated and tested "anyone who [was] symptomatic," and quarantined "exposed asymptomatic" inmates. *Id*. It also continued to provide masks and conduct temperature checks. *Id*.

On November 2, 2020, IDOC reminded inmates to stay alert for COVID-19 symptoms and encouraged masking, social distancing, and hand washing. *Id.* at 19–20.

When cases increased in January 2022, Warden Gomez notified staff and inmates that "additional PPE and cleaning supplies" would be distributed and that healthcare staff were monitoring the situation. *See* IDOC Statement of Facts, at ¶ 35 (Dckt. No. 164).

Wexford wasn't responsible for developing or implementing protocols in response to the COVID-19 pandemic. *See* Def. Wexford's Statement of Facts, at ¶ 43 (Dckt. No. 155). As a vendor for IDOC, Wexford and its employees followed IDOC's directives, including directives related to testing and notifying inmates of test results. *Id*. at ¶ 44.

During the early stage of the pandemic, inmates who tested positive for the coronavirus were quarantined, which served as a "*de facto* notification to the offender of a positive test result." *Id*. at ¶ 45. IDOC moved those offenders, not Wexford. *Id.*

**Nance's Medical History**

Nance was diagnosed with asthma before his admission to IDOC and used a rescue inhaler for years before the COVID-19 pandemic. *Id*. at ¶¶ 55–56. He also received periodic medical care at the asthma clinic. *Id*. at ¶ 57.

11

Nance's lung capacity was periodically tested, and his medical records reflect the following results of peak flow testing during relevant periods:[3]

| Date | Peak Flow |
|------|-----------|
| July 18, 2019 | 550 & 500 |
| January 9, 2020 | 410 & 450 |
| July 2, 2020 | 600 & 625 |
| January 5, 2021 | 700, 760 & 700 |

*Id.* at ¶¶ 58, 59, 68, 69.

Nance also received medical care at Stateville on six occasions between March 10, 2020, and April 26, 2020, for complaints of a runny nose, aches and pains, a headache, fatigue, an occasional cough, his taste being "off," and shortness of breath. *Id.* at ¶¶ 60–67.

Notes in Nance's medical chart show that his blood oxygen readings remained at or above 97% during that time. In fact, he did not have a body temperature consistent with a fever, and his lungs sounded clear. *Id.* On April 8, 2020, Nance tested negative for COVID-19. *Id.* at ¶ 66.

Importantly, Nance never tested positive for COVID-19. No medical provider ever told Nance that he tested positive for COVID-19 at any time relevant to this lawsuit. *See* IDOC Statement of Facts, at ¶¶ 12, 15 (Dckt. No. 164).

**Nance's Allegations**

In his complaint, Nance describes what he experienced at the time. Needless to say, a complaint isn't evidence. But the Court will summarize the allegations for purposes of setting the table.

---

[3] Peak flow differs from one person to another. *See* Peak Flow Meter, https://my.clevelandclinic.org/heath/ treatments/peak-flow-meter (last visited August 4, 2026). "A drop in your peak flow tells you that your asthma might be getting worse." *Id.*

12

In March 2020, Nance lived in B House. The complaint alleged that Warden Gomez placed B House on a Level 1 lockdown beginning March 15, 2020. *See* Cplt., at ¶¶ 3–4 (Dckt. No. 9). Prison employees and officials were not wearing face masks at the time. Nance alleged that they weren't routinely checking inmates' temperatures. *Id.* at ¶ 4. In Nance's view, business continued as usual.

Nance later testified at deposition that inmates were confined to their cells during the lockdown and allowed out only "to use the kiosk, the commissary, the showers [and] sick call." *See* Nance Dep., at 53:1-8 (Dckt. No. 164-1); IDOC Statement of Facts, at ¶ 31 (Dckt. No. 164).

In his complaint, Nance alleged that he received the bulletins issued by IDOC and Warden Gomez. But Nance alleged that the IDOC was not implementing or enforcing those policies effectively. *See* Cplt., at ¶¶ 33–34 (Dckt. No. 9); IDOC Statement of Facts, at ¶ 18 (Dckt. No. 164).

Nance claims that staff didn't comply with isolation and quarantine policies. *See* IDOC Statement of Facts, at ¶ 18 (Dckt. No. 164). He alleges that correctional officers incorrectly wore face masks or didn't wear them at all. *See* Cplt., at ¶¶ 34–54 (Dckt. No. 9). He also says that the prison had overcrowded showers, bull pens with unmasked inmates, and a lack of temperature checks, disinfectants and sanitizers. *Id.*

As an example of how the policies were not enforced, Nance attached an affidavit to his complaint from another inmate, Martell Hill. *See* Cplt., Ex. P, at 123–24 of 141 (Dckt. No. 9); *see* Def. Wexford's Statement of Facts, at ¶¶ 50–54 (Dckt. No. 155).

Hill attested that he and his cellmate were tested for COVID-19 on March 26, 2020. *Id.* The next day, his cellmate received "a letter in the mail" advising that he had tested negative. *Id.* Hill did not receive a similar letter. *Id.*

Two months later (on June 28, 2020), Hill learned from a nurse that he had tested positive for COVID-19 on March 26, 2020. *Id.* In the interim, Hill had been allowed out of his cell and in contact with other inmates in the showers, kiosks, sick call, and bull pen. *Id.*

Nance claimed during his deposition that Hill visited his cell (A-11 in B House) several times during March 2020. *See* Def. Wexford's Statement of Facts, at ¶ 49 (Dckt. No. 155).

Based on the "timeframe" – between when Hill visited Nance's cell and when Nance began to experience "symptoms" – Nance alleges that he contracted COVID-19 from Hill. *Id.* at ¶¶ 46, 48.

As another example of policies not being enforced, Nance alleged that in March and April 2020, he asked Defendant Correctional Officers Anderson and Taylor for a face mask and was denied. *See* Cplt., at ¶¶ 51–52 (Dckt. No. 9).

In his complaint, Nance alleges that he spoke up at the time and complained to Correctional Officers Anderson, Taylor, Egbe, Woodcock, Gruger, Hoeft, and Juarez a number times "about speaking to him without a mask or wearing their surgical face mask around the chins and necks." *Id.* at ¶¶ 53. But Nance did receive face masks for his own use in April 2020. *See* IDOC Statement of Facts, at ¶ 30 (Dckt. No. 164).

In March and April 2020, Nance complained about not receiving medical care when he complained of symptoms consistent with a COVID-19 infection. *See* Cplt., at ¶¶ 26–31 (Dckt. No. 9). According to Nance, he eventually was taken to "urgent care" on April 16, 2020, where Medical Director Henze told him that he had a "blockage" in his left lung. *Id.* at ¶ 30.

Nearly two years after the initial outbreak of COVID-19, Nance read about a new coronavirus outbreak in Illinois prisons. He heard accounts from other inmates that Stateville was no longer placing inmates who tested positive for COVID-19 in quarantine. *Id.* at ¶¶ 18–20.

14

Nance lived in a C House at the time. *Id*. at ¶ 20. According to Nance, IDOC was not notifying inmates if they tested positive for COVID-19. *Id.* at ¶¶ 20–21. Symptomatic inmates allegedly were allowed to pass out food, use telephones and kiosks, and shower with asymptomatic inmates. *Id*. at ¶ 42. Staff and inmates failed to wear face masks. *Id.* at ¶¶ 53–56. Communal showers and bull pens remained crowded with unmasked inmates. *Id.* at ¶¶ 42–48, 65–66, 72–73.

**Prescreening**

Based on Nance's allegations, this Court allowed four claims to proceed past screening. *See* 11/21/22 Order (Dckt. No. 10).

The first claim is a conditions-of-confinement claim under the Eighth Amendment. *See* Cplt., at ¶¶ 82–87 (Dckt. No. 9). The second claim is a deliberate indifference claim under the Eighth Amendment about his medical care. *Id.* at ¶¶ 88–95. The third claim is a *Monell* claim about the conditions of confinement. *Id.* at ¶¶ 96–106. The fourth claim alleges intentional infliction of emotional distress under state law. *Id.* at ¶¶ 107–15.

After discovery, Defendants moved for summary judgment.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

15

To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

**I.      Eighth Amendment Conditions-Of-Confinement Claim (Counts I and III)**

The Court first addresses Nance's claim under the Eighth Amendment about his condition of confinement (Counts I and III). Nance alleges that Defendants violated his Eighth Amendment rights through their inadequate COVID policies, and their failure to effectively enforce those policies.

The Eighth Amendment prohibits cruel and unusual punishment. *See* U.S. Const. amend. VIII. In evaluating claims under the Eighth Amendment, courts conduct both an objective and a subjective inquiry. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Smith v. Kind*, 140 F.4th 359, 364 (7th Cir. 2025) ("A viable Eighth Amendment claim contains both an objective and subjective component.").

16

The objective component requires a "prisoner challenging conditions of confinement [to] show that the conditions were sufficiently serious as an objective matter." *See Thomas v. Blackard*, 2 F.4th 716, 719–20 (7th Cir. 2021) (cleaned up). The subjective component requires the prisoner to "prove that prison officials acted with deliberate indifference – that they knew of and disregarded this excessive risk of harm to the inmate." *Id.*

Deliberate indifference is a "high hurdle" that requires a showing "approaching a total unconcern for the prisoner's welfare in the face of serious risks." *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). Negligence or gross negligence is not enough. *Id.*

The record does not come close to meeting that standard.

The record shows that, early in the pandemic, IDOC officials acknowledged that COVID-19 could pose a serious threat to some individuals and began implementing policies and procedures to address the threat. IDOC officials developed policies with the assistance of IDHP, which evolved as the pandemic evolved. And Wexford was not responsible for the policies.

Implementation of the policies might not have been perfect, but the Constitution does not demand perfection. *See Rosario*, 670 F.3d at 821–22. It requires only that prison officials take reasonable measures to abate a known and substantial risk of harm. *Id.* at 821. The IDOC Defendants did just that.

IDOC officials continued to provide updates to prisoners about measures they were taking. There's no evidence in the record that officials disregarded risks to Nance or other inmates without concern.

Quite the opposite. The record is chock full of examples of how the IDOC took steps to protect inmates and fight the spread of the virus. They provided cleaning supplies, distributed masks, imposed quarantines, changed protocols, distributed bulletins, limited person-to-person

17

interactions, and took countless other steps to protect everyone's health and safety. *See Money v. Pritzker*, 453 F. Supp. 3d 1103, 1131 (N.D. Ill. 2020) (Dow, J.) (finding that IDOC prisoners had "no chance of success" on Eighth Amendment conditions claim stemming from policies and procedures implemented by IDOC in response to COVID-19 pandemic).

The record shows that officials followed ongoing guidance and acted to make changes as the COVID situation evolved. And Nance offered no evidence that officials disregarded more effective policies.

The pandemic posed a serious challenge, and IDOC took it seriously. On this record, Nance has fallen far short. The record cannot support a finding in his favor on the objective or the subjective prongs of a claim under the Eighth Amendment.

Defendants Director Jeffreys and Warden Gomez are entitled to summary judgment stemming from their role in implementing policies responsive to the COVID-19 pandemic (Counts I and III), along with Wexford (Count III).

Nance also argues that IDOC officials and individual correctional officers violated the Eighth Amendment because they failed to enforce the COVID-19 policies put in place. The IDOC Defendants' briefing on claims stemming from enforcement of the pandemic policies is not particularly thorough. But even when construed in Nance's favor, the record does not suggest that any Defendant acted with the requisite level of culpability.

Liability under section 1983 rests on personal responsibility. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). A "government official is liable only if he personally caused or participated in a constitutional deprivation. Consequently, a claim will not survive a motion to dismiss unless it pleads that a Government-official defendant, through the official's own

18

individual actions, has violated the Constitution." *See Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022) (cleaned up).

Section 1983 does not create liability based on *respondeat superior* or vicarious liability. Officials are "accountable only for their own misconduct." *See Hess v. Garcia*, 72 F.4th 753, 767 (7th Cir. 2023). "Liability for supervisors is individual, not vicarious. For that reason, simply being atop an organizational food chain does not make a supervisor liable for a subordinate's unconstitutional conduct." *See Bostic v. Murray*, 160 F.4th 831, 841 (7th Cir. 2025).

In the Eighth Amendment conditions-of-confinement context, a prisoner must be able to show that the defendant knew of and disregarded "an excessive risk to [the prisoner's] health or safety." *See Farmer*, 511 U.S. at 837. This burden requires evidence that each defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and the defendant "dr[e]w the inference." *Id.*

Nance's complaint survived screening largely because of broad allegations. He alleged that inmates who tested positive for COVID-19 were not isolated or quarantined. He also claimed that prisoners showered without masks and were confined to bull pens with unmasked prisoners. The complaint says that guards and prisoners failed to wear face masks, and that prisoners were not informed of their COVID-19 test results.

But few allegations attributed specific conduct to a specific defendant. Sweeping allegations are not enough to create a triable issue of fact as to a particular Defendant's state of mind.

19

Even in his complaint, many of the allegations do not specify dates or mention a defendant by name. And at this stage in the game, Nance also failed to offer evidence to back up his more specific claims.

Specifics are important. IDOC's pandemic policies were not static. For example, at first, only correctional officers were given masks to prevent them from bringing COVID-19 into the prison. Masks eventually were provided to inmates as IDOC officials learned more about transmission of the novel coronavirus.

Consistent with the evolving policy, Nance received a mask or masks sometime in April 2020 (presumably after IDOC began requiring masks for inmates), even though he might not have received a mask at the exact moment that he requested one from Defendants Anderson and Taylor.

Masks were also just one tool used by IDOC to combat the spread of COVID-19. Staff and inmates were regularly tested for COVID-19. Staff who tested positive quarantined at home, and inmates who tested positive were isolated. Housing units were locked down, and movement was restricted to a handful of activities like showers, healthcare visits, and kiosk access.

Keeping inmates and staff safe was a tall order. So, the fact that inmates might have been unmasked in showers and bull pens on occasion, that a guard did not wear his or her mask "properly" on occasion, or that a few COVID-positive inmates were not quarantined, simply is not enough to show that any individual Defendant appreciated that his or her conduct would necessarily place Nance at substantial risk of harm. *See Byrd v. Munoz*, 2025 WL 943408, at *2 (7th Cir. 2025) (explaining that prison staff were "careless or negligent by improperly wearing or refusing to wear masks," but their conduct did not rise to deliberate indifference); *McKinley v. Gomez*, 2026 WL 1031170, at *5 (N.D. Ill. 2026) (finding that Stateville's failure to implement

20

an effective isolation policy consistent with IDOC recommendations did not "elevate [Gomez's] conduct from negligence to criminal recklessness.").

The record also does not show a cognizable harm resulting from Defendants' conduct. A prisoner cannot prevail on his claim by demonstrating that a Defendant's conduct "merely exposed him to a risk of harm." *See Maus v. Murphy*, 29 F. App'x 365, 369 (7th Cir. 2002); *see Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016); *Byrd*, 2025 WL 943408 at *2.

Here, Nance failed to offer evidence of a harm. He never tested positive for COVID-19, let alone suffered a physical harm from an infection. Nance's allegation that he contracted COVID-19 and lung damage from Defendants' conduct lacks evidentiary support.

So, the IDOC Defendants are entitled to summary judgment on the claims alleging imperfect enforcement of the pandemic policies.

## II.    Eighth Amendment Deliberate Indifference Claim (Count II)

Nance also alleges that the Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment.

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim that his medical care violated the Eighth Amendment, a prisoner must prove that: (1) he suffered from an objectively serious medical condition, and (2) the defendant knew about and was deliberately indifferent to the condition. *See Lockett v. Bonson*, 937 F.3d 1016, 1022–23 (7th Cir. 2019) (cleaned up).

The record contains no evidence that Nance suffered from an objectively serious medical condition. A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a

21

doctor's attention." *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up).

Nance failed to show that he suffered an objectively serious medical condition. Nance did have asthma, which made him more vulnerable to the effects of COVID-19. But the record confirms that Nance received regular medical treatment for that condition.

Asthma might have increased the risks posed by COVID-19. But that risk didn't materialize.

Nance never tested positive. Nance wasn't diagnosed with COVID-19 during the period at issue. He experienced only symptoms consistent with a cold or possibly the flu, which is not a serious medical need. *See Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997).

As to his purported lung damage, Nance alleged that Dr. Henze told him that he had a "lung blockage," but Nance's recollection of Dr. Henze's statement is hearsay. He never offered admissible evidence to support his claim. That's not enough to create a triable issue of fact, and Nance's medical records show that his lung capacity increased during the time covered by this lawsuit.

He also failed to show how the Defendants were deliberately indifferent to his medical needs. When Nance requested medical attention, medical professionals treated his ailments. The Defendants never stood in his way. There's no evidence of wrongful conduct, let alone deliberate indifference.

Nance failed to support his claim that the medical care he received violated the Eighth Amendment. So, Defendants are entitled to summary judgment on Nance's claim of deliberate indifference to his medical needs (Count II).

### C. Qualified Immunity

Director Jeffreys and Warden Gomez also argued that they enjoy qualified immunity on any claim challenging IDOC's COVID-19 policies, or their role in developing or implementing the policies.

Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity rests on two questions: "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021)   If the plaintiff fails to prove either prong, "the defendant official is protected by qualified immunity." *Id.* (citing *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019)).

Nance has come up short on both prongs. He has not established a violation of a constitutional right, let alone that the right was clearly established at the time.

The pandemic was a historic event in the nation's history. It posed significant challenges, and there wasn't a lot of precedent to draw upon. The playbook didn't have a lot of play for how best to deal with a virus sweeping through prisons and every other corner of society.

The situation confronted by prison officials was unique, and established law at the time didn't provide them with guidance. Nance had the burden to identify a reasonably analogous case, and he failed to make that showing. *See Villalobos v. Picicco*, 168 F.4th 1057, 1063 (7th Cir. 2026) (explaining that district court "must" grant summary judgment for a defendant if the

23

plaintiff does not identify "a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand").

So, Jeffreys and Gomez are entitled to qualified immunity.

### D.     Intentional Infliction of Emotional Distress (Count IV)

The last remaining claim the state-law intentional infliction of emotional distress claim. This Court has supplemental jurisdiction over that state-law claim because it was part of the same controversy as Nance's federal law claims. *See* 28 U.S.C. § 1367(a).

"To prevail on an intentional infliction of emotional distress claim under Illinois law, a claimant must prove three elements. First, the conduct in question was truly extreme and outrageous. Second, the actor intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would have caused such distress. Third, the conduct in fact caused severe emotional distress." *Sun v. Xu*, 99 F.4th 1007, 1013 (7th Cir. 2024) (internal citations omitted).

"The requirements to prove this tort are rigorous. Liability will lie only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Wells v. Freeman Co.*, 94 F.4th 608, 618 (7th Cir. 2024) (cleaned up). "The tort 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Sun*, 99 F.4th at 1013 (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)).

Once again, Nance has come up short. He did not present evidence satisfying any of the elements, let alone all of them.

**Conclusion**

For those reasons, the Court grants Defendants' motions for summary judgment. *See*

Def. Wexford Mtn. for Summ. J. (Dckt. No. 154); IDOC Mtn. for Summ. J. (Dckt. No. 163).

Date: August 8, 2026

Steven C. Seeger
United States District Judge